PROBLEMS

## PROBLEM

TOPIC E-19        MOST SERIOUS PROBLEM: OFFERS IN COMPROMISE

MOST SERIOUS PROBLEMS

DID YOU KNOW?

◆ The number of Offer in Compromise (OICs) returned to taxpayers increased from 43,936 (or 39 percent) in FY 2001 (prior to centralization in IRS campuses) to 70,911 (or 57 percent) in FY 2004 (after centralization).[1]

◆ Although the percentage of OICs "disposed of" within the IRS' six-month goal has increased from 32 percent in FY 2001 (prior to centralization) to 55 percent in FY 2004, the average OIC processing time increased from 310 days in FY 2001 to 380 days in FY 2003.[2]  (No comparable data is available for FY 2004).

◆ The number of OICs accepted declined from 38,643 (or 34 percent) in FY 2001 to 19,546 (or 16 percent) in FY 2004, while the number rejected increased from 13,976 (or 12 percent) in FY 2001 to 25, 654 (or 21 percent) in FY 2004.[3]

◆ A recent IRS study found that:[4]

  ◆ Approximately 30 percent of the OICs received by the IRS were previously returned to the taxpayer.

  ◆ When returned OICs were resubmitted, 24 percent were ultimately accepted, 55 percent were returned again and dropped out of the system, 12 percent were rejected, and 10 percent were withdrawn.

  ◆ About 80 percent of the taxpayers with accepted OICs remained substantially compliant during the following five years.

  ◆ Twenty percent of the individual tax accounts and 45 percent of the business tax accounts associated with rejected or withdrawn OICs were classified as "currently not collectible."

  ◆ The IRS eventually collected less than 80 percent of what individual taxpayers were offering in 54 percent of the OICs that it rejected and in 66 percent of the OICs that it returned after acceptance for processing.

  ◆ The IRS eventually collected less than half of what individual taxpayers were offering in 44 percent of the OICs that it rejected, and in 59 percent of the OICs that it returned after acceptance for processing.

  ◆ The IRS collected nothing from individual taxpayers in 21 percent of the OICs that it rejected and in 37 percent of the OICs that it returned after acceptance for processing.  The IRS collected nothing from business taxpayers in 46 percent of the OICs that it rejected and in 60 percent of the OICs that it returned after acceptance for processing.

---

[1] SB/SE, Offer in Compromise Program, Executive Summary for the Oversight Board, FY 2001 and FY 2004.

[2] Id; SB/SE Performance Measurement, Collection Quality Measurement System (CQMS) Database, Closed Date Compressed Report – National Results, FY 2001 and FY 2003.

[3] SB/SE, Offer in Compromise Program, Executive Summary for the Oversight Board, FY 2001 and FY 2004.

[4] SB/SE Payment Compliance and Office of Program Evaluation and Risk Analysis (OPERA), *IRS Offers in Compromise Program, Analysis of Various Aspects of the OIC Program*, Sept. 2004.  The collectibility results, discussed below, included cases closed in 1998 and collections through Sept. 8, 2003.  *Id.*

**MOST SERIOUS PROBLEMS**

**PROBLEMS**

### RESPONSIBLE OFFICIALS

Kevin M. Brown, Commissioner, Small Business/Self Employed Operating Division
David B. Robison, Chief, Appeals

### DEFINITION OF PROBLEM

The Internal Revenue Service's (IRS') "offer in compromise" (OIC) program allows for
the compromise of tax liabilities based upon "doubt as to liability" or "doubt as to col-
lectibility," or in furtherance of "effective tax administration."[5]  The IRS' goal for the OIC
program is to achieve collection of what is reasonably collectible at the least cost and at
the earliest possible time, and to promote future compliance by providing taxpayers with
a "fresh start."[6]  OICs also promote future compliance by requiring, as a condition of the
OIC agreement, that the taxpayer file returns and pay taxes for the following five years.[7]
In 1998, Congress expanded the bases for compromise to include "effective tax adminis-
tration," based on its belief that OICs promote voluntary compliance.[8]  The intended
effect of this expansion was generally to increase the IRS' flexibility in accepting OICs.
The conference report for this legislation explained:

> The conferees believe that the IRS should be flexible in finding ways to
> work with taxpayers who are sincerely trying to meet their obligations and
> remain in the tax system.  Accordingly, the conferees believe that the IRS
> should make it easier for taxpayers to enter into offer-in-compromise agree-
> ments, and should do more to educate the taxpaying public about the
> availability of such agreements.[9]

Notwithstanding this legislative history, IRS policies and practices adopted since 1998 in
many cases do not enable the IRS to be flexible or make it easy for taxpayers to enter into
OICs.  To the contrary, IRS practices and policies continue to make it very difficult for
taxpayers to enter into OICs.  Moreover, a recent IRS study suggests that in a majority of
cases when an OIC is rejected or returned to the taxpayer, the IRS eventually collects *less
than the amount that was offered.*[10]

---

[5]  *See* Treas. Reg. § 301.7122-1, et. seq.; Form 656, Offer in Compromise (Rev. 7-2004).

[6]  Policy Statement P-5-100, IRM 1.2.1.5.18 (Rev. 1-30-1992).

[7]  Form 656, Offer in Compromise (Rev. 7-2004).  A recent IRS study found that about 80 percent of taxpayers
in its sample with accepted OICs remained substantially compliant during the requisite period.  SB/SE
Payment Compliance and Office of Program Evaluation and Risk Analysis (OPERA), *IRS Offers in Compromise
Program, Analysis of Various Aspects of the OIC Program,* 6, September 2004.

[8]  IRS Restructuring and Reform Act of 1998, Pub. L. No. 105-206 (1998); H.R. Conf. Rep. 599, 105th Cong.,
2d Sess., 288-289 (1998) (stating that "[t]he Senate amendment provides that the IRS will adopt a liberal
acceptance policy for offers-in-compromise to provide an incentive for taxpayers to continue to file tax returns
and continue to pay their taxes….  The conferees believe that the ability to compromise tax liability …
enhances taxpayer compliance.")

[9]  *Id.*

[10]  *See* SB/SE Payment Compliance and Office of Program Evaluation and Risk Analysis (OPERA), *IRS Offers in
Compromise Program, Analysis of Various Aspects of the OIC Program,* 11 (Sept. 2004).

The IRS is increasingly returning or rejecting OICs received from taxpayers.[11] Unnecessary OIC returns and rejections are inconsistent with OIC program goals of providing taxpayers with a legitimate alternative method of resolving their tax liabilities (i.e, an alternative to the use of "protracted installment agreements" or classification as "currently not collectible")[12] and a fresh start toward maintaining future compliance, as well as the IRS' overall goal of "improving customer service."[13] Further, the high rate of OIC returns and rejections has not been shown to be cost effective because, in many cases, returned OICs will be submitted again for processing, and many rejected OICs will be processed again by the IRS' Appeals function.[14]

The National Taxpayer Advocate believes that the increase in OIC returns and rejections reflect IRS' use of inflexible policies and automated processes to reduce OIC inventory without regard to how they affect individual taxpayers or whether they actually achieve their goals. We discuss various aspects of these concerns below.

## ANALYSIS OF PROBLEM

### Background

In August 2001, faced with an increasing number of OICs and rising processing delays, the IRS adopted an OIC inventory reduction strategy.[15] This involved centralizing OIC processing for simple offers (from wage earners) to be worked in the Brookhaven and Memphis campuses (previously called service centers), while still processing complex offers in the field.[16] Today, approximately 66 percent of all OICs are fully processed in the campuses rather than the field.[17]

The inventory reduction strategy also led the Small Business / Self Employed Operating Division (SB/SE), on August 29, 2001, to reduce the number of attempts it would make

---

[11] SB/SE, Offer in Compromise Program, Executive Summary for the Oversight Board, FY 2001 through FY 2004.

[12] A "protracted installment agreement" is currently defined as an installment agreement extending beyond the statutory period of limitations for collection plus five years. IRM 5.8.1.1.3(1) (Rev. 11-15-2004). An account classified as "currently not collectible" will not be subject to immediate collection action, but the liability will remain outstanding. *See generally* IRM 5.16 (Rev. 1-01-2004).

[13] Policy Statement P-5-100, IRM 1.2.1.5.18 (Rev. 1-30-1992) (describing OIC policy); Form 656, Offer in Compromise 1 (Rev. 7-2004) (same); IRS Strategic Plan 2005-2009, Publication 3744 (Rev. 6-2004), 12 (identifying "customer service" as a goal); SB/SE Strategic Plan FY 2004-2005 (Rev. 3-31-2004), 8 (discussing SB/SE's goal of providing "top-quality service to each taxpayer in every interaction").

[14] SB/SE Payment Compliance and Office of Program Evaluation and Risk Analysis (OPERA), *IRS Offers in Compromise Program, Analysis of Various Aspects of the OIC Program*, 3 (Sept. 2003).

[15] *See* Treasury Inspector General for Tax Administration, *Continued Progress Is Needed to Improve the Centralized Offer in Compromise Program*, Reference 2003-30-182, 1-3 (Sept. 2003) (discussing the increase in offers beginning in 1998, and the IRS' adoption of batch processing techniques); General Accounting Office, IRS Should Evaluate the Changes to Its Offer in Compromise Program, GAO-02-311 (March 15, 2002).

[16] *See* General Accounting Office, *IRS Should Evaluate the Changes to Its Offer in Compromise Program*, GAO-02-311 (March 15, 2002).

[17] SB/SE, Offer in Compromise Program, Executive Summary for the Oversight Board, FY 2004. All offers are initially screened at the campuses to determine processability, but then some are transferred to the field. *Id*; IRM 5.8.2.2(3) (Rev. 11-15-2004).

to obtain information before returning an OIC from "at least two" to one.[18]  After an OIC has been accepted for processing, a single communication attempt by phone, in person, or by letter remains the only prerequisite for returning an OIC on the basis of the taxpayer's failure to provide information.[19]

In an effort to offset the cost of processing offers that are ultimately rejected or returned and deter the submission of frivolous OICs, the IRS imposed a user fee on OIC submissions.[20]  Since November 1, 2003, the IRS has required taxpayers submitting offers, except those based solely on doubt as to liability, to include a $150 user fee or a low income fee waiver form with their OICs.[21]  Offers received without the fee (or the form) are returned as "not processable."[22]  Although the fee may be deterring OIC submissions, it is unclear which submissions are being deterred or whether other OICs are being processed more quickly.  We do know, however, that the fee increases the cost to taxpayers when OICs are returned or rejected, regardless of the reason for the return or rejection.

### COIC Efficiency with Substantive OIC Processing Not Documented

Centralized offer in compromise (COIC) processing has reduced OIC "cycle times"[23] and inventory backlogs[24] by returning more offers to taxpayers rather than by accepting and rejecting more offers.[25]  The volume of OICs returned as either "not processable" or after acceptance for processing has increased from 39 percent in FY 2001 to 57 percent in FY 2004, as shown in Table 1.19.1, OIC Dispositions, Fiscal Year Comparison.  As a result, IRS has been evaluating the substance of **fewer** offers since centralized OIC processing was adopted.[26]

---

[18] Memorandum from Deputy Director, Compliance Policy, regarding Return Criteria for Offers in Compromise (Aug. 29, 2001).

[19] IRM 5.8.7.2.2.2 (Rev. 11-15-2004).

[20] T.D. 9086, 68 Fed. Reg. 48,785 (Aug. 15, 2003); Treas. Reg. § 300.3.

[21] Id.

[22] Rev. Proc. 2003-71, 2003-36 I.R.B. 517 § 5.01; Form 656, *Offer in Compromise* (Rev. 7-2004) 2.  Procedures for returning a "not processable" offer do not always include contacting the taxpayer before the OIC is returned. See IRM 5.8.3 (Rev. 11-15-2004).

[23] SB/SE, Offer in Compromise Program, Executive Summary for the Oversight Board, FY 2001 and FY 2004 (reflecting cycle time improvement).  "Cycle time" generally refers to OIC processing time, *i.e.*, the period between IRS' determination that an OIC is processable and disposition of the OIC.

[24] Since centralization was adopted in 2001, the ending inventory has been reduced each year, from 94,931 in FY 2001 to 47,113 in FY 2004.  SB/SE, Offer in Compromise Program, Executive Summary for the Oversight Board, FY 2001 through FY 2004.

[25] *See* Treasury Inspector General for Tax Administration, *Continued Progress Is Needed to Improve the Centralized Offer in Compromise Program*, Reference 2003-30-182 (September 2003).

[26] 52,619 OICs (or 46 percent) were accepted or rejected in FY 2001 as compared to 45,200 (or 36 percent) in FY 2004, as shown on Table 1.19.1, OIC Dispositions, Fiscal Year Comparison.

**TABLE 1.19.1, OIC DISPOSITIONS, FISCAL YEAR COMPARISON[27]**

| OIC Disposition | FY 2001 | | FY 2002 | | FY 2003 | | FY 2004 | |
|---|---|---|---|---|---|---|---|---|
| Returned Not Processable | 16,185 | 14% | 32,897 | 23% | 30,406 | 22% | 38,553 | 31% |
| Returned Processable | 27,751 | 25% | 50,492 | 35% | 49,079 | 36% | 32,358 | 26% |
| Accepted | 38,643 | 34% | 29,140 | 20% | 21,570 | 16% | 19,546 | 16% |
| Rejected | 13,976 | 12% | 16,952 | 12% | 27,336 | 20% | 25,654 | 21% |
| Withdrawn or Terminated | 16,654 | 15% | 13,621 | 10% | 8,431 | 6% | 7,859 | 6% |
| Total | 113,209 | 100% | 143,102 | 100% | 136,822 | 100% | 123,970 | 100% |

As the IRS has been substantively evaluating fewer OICs, the percentage of OICs disposed of within the IRS' six-month goal has increased from 32 percent in FY 2001 (prior to centralization) to 55 percent in FY 2004,[28] but the *average* time to process an OIC has also *increased* from 310 days in FY 2001 to 380 days in FY 2003.[29] (The IRS has no comparable data for FY 2004). While statistics showing cycle time improvements may reflect actual improvements, they could instead be explained by the fact that OIC returns (after acceptance for processing), which occur at the beginning of the OIC evaluation process, are counted as dispositions.[30] The IRS' focus on the aggregate number of "dispositions" or OICs "processed" over a given period is misplaced because such statistics show improvement as OIC *returns* increase.[31] The IRS does not track whether COIC processing is actually more efficient at substantive OIC processing.[32] Thus, IRS data suggest that COIC processing may be efficient only at quickly returning OICs and may not be more efficient than IRS field offices at substantively evaluating them to reach acceptance or rejection decisions.

[27] *Id.* These numbers include dispositions by Appeals as well as Compliance because IRS statistics do not break-out "rejections" by Compliance. E-mail from Director, Appeals Tax Policy and Procedures (SBSE and W&I) (Jul. 6, 2004). However, since only rejections by Compliance are appealed, if Compliance numbers were reported separately, the number of acceptances would be lower and the number of rejections would be higher.

[28] SB/SE, Offer in Compromise Program, Executive Summary for the Oversight Board, FY 2001 to FY 2004.

[29] SB/SE Performance Measurement, Collection Quality Measurement System (CQMS) Database, Closed Date Compressed Report – National Results, FY 2001 and FY 2003. Of course, cycle times could be affected by shifts in IRS personnel. For example, some OIC specialists have been reassigned to traditional field collection assignments. *SB/SE Strategy and Program Plan*, FY 2004-FY 2005 (Rev. 9-25-2003) 30, 34. IRS should determine which offers are taking longer under existing procedures and take appropriate steps to address such delays.

[30] SB/SE Performance Measurement, Collection Quality Measurement System (CQMS) Database, Closed Date Compressed Report – National Results (definitions).

[31] The aggregate number of OIC "dispositions" that occur in less than 6 months are reported to the IRS Oversight Board. In addition, one IRS Performance Plan measure is the number of OICs "processed" during the period. IRS, *Fiscal Year 2004 Annual Performance Plan* (Feb. 3, 2003), A-4. Focusing on this aggregate cycle time data may communicate the message that IRS views OIC returns as a positive result rather than as a failure to educate taxpayers and work with them as Congress intended. See H.R. Conf. Rep. 599, 105th Cong., 2d Sess., 289 (1998).

[32] E-mail response to TAS Information Request from SB/SE (Nov. 10, 2004).

**MOST SERIOUS PROBLEMS**

### OIC Returns Lengthen Real "Cycle Times" and Waste Resources

IRS cycle time statistics are also understated because a recent study found that about 30 percent of all OIC receipts were previously returned.[33] Taxpayers, on average, wait for the IRS' acceptance or rejection decision longer than reflected in cycle time statistics because many of them resubmit OICs after they are returned.[34] Therefore, the IRS could reduce its OIC receipts, as well as the actual time it takes to process them, by reducing OIC returns. Further, in many cases even the taxpayer's costs to resubmit a returned OIC will ultimately be borne by the government because those costs (as well as others incurred before the OIC is accepted) will reduce the amount available to be paid to the government. A true measure of cycle time would break out cycle time by type of disposition (e.g., return, acceptance, rejection, withdrawal or termination). It would also measure the time the IRS and taxpayers waste when the OIC is returned and then resubmitted.

*OIC Returns Indicate Lack of Communication*

The high OIC return rates suggest that the IRS is not taking time to effectively communicate with taxpayers. In each fiscal year since COIC processing was adopted, the IRS has returned at least 57 percent of all OICs, either before or after accepting them for processing.[35] Seventy-two percent of OICs that were not processable in FY 2003 (and 41 percent in FY 2004) were given this classification because the taxpayer had not filed all required tax returns, as shown on Table 1.19.2, Reasons for "Not Processable" OIC Returns, below. Communicating with taxpayers and giving them a reasonable period of time to file any delinquent tax returns prior to returning an OIC would reduce erroneous OIC returns, educate taxpayers, and enable the IRS to both collect money being offered and secure delinquent returns in one fell swoop![36]

---

[33] SB/SE Payment Compliance and Office of Program Evaluation and Risk Analysis (OPERA), *IRS Offers in Compromise Program, Analysis of Various Aspects of the OIC Program*, September 2004, 3.

[34] In November 2001, SB/SE Research warned that "[c]ompliance should consider monitoring the OIC cases that are returned to customers to make sure that offers examiners and offers specialists are not exceeding the return criteria in order to lower inventory levels. While returning a case may help short-term with OIC inventory levels, it harms customer satisfaction and causes the IRS to handle the same offers several times instead of just once." SB/SE Research Headquarters, *Offer in Compromise – Centralized Processing Profile*, Project 13.29 Final Report, 17 (November 2001).

[35] SB/SE, Offer in Compromise Program, Executive Summary for the Oversight Board, FY 2001 through FY 2004.

[36] IRS currently returns OICs from nonfilers even if no tax was due for the period of nonfiling. See IRM 5.8.3.4.1 (Rev. 5-15-2004).

### TABLE 1.19.2, REASONS FOR "NOT PROCESSABLE" OIC RETURNS[37]

| Reason | FY 2003 | | FY 2004 | |
|---|---|---|---|---|
| Returns not filed | 21,752 | 72% | 15,905 | 41% |
| Open bankruptcy proceeding | 4,882 | 16% | 3,501 | 9% |
| Form 433-A not included | 2,855 | 9% | 3,823 | 10% |
| Previous 2 quarters of employment tax not filed/paid | 1,969 | 6% | 1,664 | 4% |
| Obsolete Form 656 | 1,137 | 4% | 333 | 1% |
| Obsolete Form 433-A/B | 1,111 | 4% | 320 | 1% |
| Current employment tax deposit not timely | 880 | 3% | 694 | 2% |
| Form 433-B not included | 164 | 1% | 353 | 1% |
| Not a verbatim duplicate | 33 | 0% | 125 | 0% |
| Fee not with offer | 0 | 0% | 20,688 | 54% |
| Returns not filed - both spouses | 0 | 0% | 1,020 | 3% |

A lack of communication also contributes to the high rate of OICs returned after acceptance for processing. Sixty-seven percent of OICs that were returned after acceptance for processing in FY 2003 (and 61 percent in FY 2004) were returned because, according to the IRS, the taxpayer did not submit sufficient financial verification, as shown on Table 1.19.3, Reasons for OIC Returns after Acceptance for Processing, below. The statistics do not indicate the extent to which the IRS contacted taxpayers and their representatives to obtain sufficient financial verification, whether those efforts were reasonable, or whether the verification that the IRS was seeking was reasonable.[38] Practitioners tell us that in some cases the IRS is returning offers without any apparent attempts to communicate with the taxpayer or their representative, and in other cases COIC employees place calls into different time zones or during COIC "swing shifts" outside of the hours during which the taxpayer or representative may reasonably be available. Regardless of whether IRS or taxpayers are responsible for communication failures in a given instance, the IRS could reduce OIC returns by increasing communication with taxpayers and their representatives.

The IRS, however, intentionally reduced communication attempts before returning offers from "at least two" to one so that it could reduce the time employees spend processing

---

[37] SB/SE, Automated Offer In Compromise 4196 Report, FY 2003 and FY 2004. Because OICs are sometimes returned for multiple reasons, these numbers exceed the total number of OICs returned as "not processable" and these percentages exceed 100 percent. The percentages were calculated by dividing the returns in each category by the total number of OICs returned as "not processable," as shown in Table 1.19.1, OIC Dispositions, Fiscal Year Comparison.

[38] The IRS may return an offer for insufficient information after a single request has been made by phone, in person or by letter when the information is not received by the deadline set by the IRS employee. IRM 5.7.2.2.2 (Rev. 5-15-2004). Practitioners have suggested that IRS' OIC return policies are unreasonable. *See, e.g.,* Brant Goldwyn, *Dispute Resolution: IRS Revises OIC Letters Sent to Taxpayers; Practitioners Advise IRS of OIC Concerns,* 20 DAILY TAX REPORT G-7 (Feb. 2, 2004) (stating that "[b]y not giving additional time or calling practitioners and explaining what's needed, [IRS is] seizing the opportunity to return the offer"). However, IRS procedures now allow for some additional communication before returning offers based upon inadequate expense documentation in cases where the taxpayer has substantially responded to the IRS' information request. *See* IRM 5.8.3.16 (Rev. 11-15-2004).

OIC submissions that it deemed not to be serious.[39]  The premise of this decision was that returning offers would allow IRS employees to consider serious OICs more quickly.[40]  It was never contemplated that serious offers would be returned without reasonable communication attempts.  The IRS has not determined whether reduced communications have actually resulted in faster substantive evaluation of other OICs or saved IRS resources.[41]

### TABLE 1.19.3, REASONS FOR OIC RETURNS AFTER ACCEPTANCE FOR PROCESSING[42]

| Reason | FY 2003 | | FY 2004 | |
|---|---|---|---|---|
| Financial verification not provided | 39,915 | 67% | 19,656 | 61% |
| Estimated tax payments not made | 4,736 | 10% | 4,337 | 13% |
| Returns not filed | 4,624 | 9% | 2,916 | 9% |
| Missing periods | 1,272 | 3% | 682 | 2% |
| No basis for compromise | 1,070 | 2% | 776 | 2% |
| Other pending investigation | 1,053 | 2% | 1,133 | 4% |
| Current employment tax deposit not timely | 1,034 | 2% | 857 | 3% |
| Previous 2 quarters of employment tax not filed/paid | 903 | 2% | 609 | 2% |
| Open bankruptcy proceeding | 804 | 2% | 479 | 1% |
| Financial verification nonliable party | 758 | 2% | 521 | 2% |
| To delay collections | 749 | 2% | 784 | 2% |
| Form 433-a missing information | 619 | 1% | 290 | 1% |
| Resubmission of prior rej/ret offer | 511 | 1% | 585 | 2% |
| Erroneous periods included | 448 | 1% | 242 | 1% |
| Form 433-a not included | 400 | 1% | 177 | 1% |
| More than the balance due | 303 | 1% | 159 | 0% |
| Obsolete form 656 | 296 | 1% | 75 | 0% |
| Offer amount not entered | 293 | 1% | 119 | 0% |
| Payment terms missing | 248 | 1% | 91 | 0% |
| Form 433-b not included | 233 | 0% | 165 | 1% |
| Waiver of fee not substantiated | 0 | 0% | 447 | 1% |
| Dishonored check for user fee | 0 | 0% | 282 | 1% |

[39] *See* General Accounting Office, *IRS Should Evaluate the Changes to Its Offer in Compromise Program*, GAO-02-311, 24-25 (March 15, 2002).

[40] *See id.*

[41] In the context of Earned Income Tax Credit (EITC) audits, a recent study suggested that increased up-front communications with taxpayers may reduce IRS expenses by reducing audit reconsideration requests.  National Taxpayer Advocate, *Annual Report to Congress Volume II, The National Taxpayer Advocate's Earned Income Tax Credit (EITC) Audit Reconsideration Study*, Publication 2104, (Rev. 12-2004) 6, 13-16.  Similarly, increased up-front communication might reduce the cost of OIC processing by reducing offer resubmissions and Appeals.

[42] SB/SE, Automated Offer In Compromise 4196 Report, FY 2003 and FY 2004.  Because OICs are sometimes returned for multiple reasons, these numbers exceed the total number of OICs returned after acceptance for processing and these percentages exceed 100 percent.  The percentages were calculated by dividing the returns in each category by the total number of OICs returned after acceptance for processing, as shown in Table 1.19.1, OIC Dispositions, Fiscal Year Comparison.  Items representing less than one percent are not included.

MOST SERIOUS PROBLEMS

### OIC Form Revision May Reduce Returns

In July 2004 the IRS made progress in improving communication with taxpayers by revising its OIC form (Form 656). The new form was developed with comments from the Taxpayer Advocate Service (TAS) and practitioner groups. The revised form may help to reduce OIC returns resulting from the failure to include a user fee with the OIC application because the user fee requirement is clearly stated on the new form.[43] It may also be helpful in reducing OIC returns based on the failure to have filed all tax returns because the new form has space for taxpayers to include an explanation if they were not legally required to file a return.[44] While additional revisions could make the OIC forms and worksheets even less complex and confusing for taxpayers, the new form is an improvement.

### OIC User Fee is an Unintended Barrier to OIC Processing

The user fee has become a barrier to OIC processing, which exacerbates the problem of OIC returns.[45] The fee was not intended to be a barrier to OIC processing or to multiply the burden associated with the return of an OIC to a cooperative taxpayer. It was intended to reduce the number of frivolous offers as well as the number withdrawn, returned, or rejected because the taxpayer would not provide adequate information for the IRS to process the offer or would not offer an amount that reflected the taxpayer's ability to pay.[46] When they issued the user fee regulations, the IRS and the Treasury Department assumed that once an offer was accepted for processing, the IRS would "work closely with taxpayers to perfect incomplete or inadequate offers before returning or rejecting them,"[47] thereby avoiding unnecessary returns based upon a lack of reasonable communication. To the extent a lack of reasonable communication by the IRS is responsible for OIC returns, the fee is being imposed, sometimes multiple times, in cases where it was not intended to be imposed at all.[48]

---

[43] Form 656, *Offer in Compromise* (Rev. 7-2004) 2.

[44] *Id.*

[45] Between November 2003 (when the user fee became effective) and September 2004, 20,688 offers were returned because the taxpayer failed to include the fee or the waiver form, surpassing failure to file returns as the number one reason for offers to be not processable. SB/SE, Automated Offer In Compromise 4196 Report, FY 2004. However, a recent study suggests that the percentage of offers returned for failure to include the fee declined from over 60 percent in December 2003 to under 15 percent in July 2004. SB/SE Payment Compliance and Office of Program Evaluation and Risk Analysis (OPERA), *IRS Offers in Compromise Program, Analysis of Various Aspects of the OIC Program*, 5-6 (Sept. 2004).

[46] T.D. 9086, 68 Fed. Reg. 48,785, 48,786 (Aug. 15, 2003) (preamble).

[47] *Id.*

[48] *See* Treasury Inspector General for Tax Administration, *Continued Progress Is Needed to Improve the Centralized Offer in Compromise Program*, Reference 2003-30-182, 1 (Sept. 2003) (indicating that 15 percent of the OICs returned after acceptance for processing were inappropriately returned); SB/SE Payment Compliance and Office of Program Evaluation and Risk Analysis (OPERA), *IRS Offers in Compromise Program, Analysis of Various Aspects of the OIC Program*, 4-5 (Sept. 2004) (indicating that 24 percent of all resubmitted offers are ultimately accepted). In a recent case, married taxpayers submitted an OIC for both joint and separate liabilities with two fees ($300). It was erroneously returned after acceptance for processing because IRS believed the taxpayers had not filed all required returns. Even if the IRS had been correct that the taxpayers had not filed all returns, the OIC should have been returned with the fee before acceptance for processing. The taxpayers actually had no filing requirement for the years in question, but had to wait for IRS to process the OIC twice and resubmit the OIC with two more fees ($600 total) when a single phone call could have resolved the situation and allowed the OIC to be processed without additional fees or delay. Although TAS was able to get two of the fees ($300) abated, this process seemed unreasonable from the taxpayers' perspective.

**MOST SERIOUS PROBLEMS**

**PROBLEMS**

### Returning Offers Unnecessarily

The IRS sometimes unnecessarily returns an offer that could have been evaluated based on available information. For example, an OIC submission was returned because four out of 50-60 pages of the OIC packet, which were not needed to complete the analysis, were not received. The OIC was later resubmitted and rejected without the missing pages. The OIC was returned because IRS did not evaluate whether the missing information was needed to process the offer.[49] The decision to return an OIC amounts to a *de facto* rejection because the liability remains outstanding and IRS retains the fee, but the taxpayer is denied appeal rights that would be available if the OIC were rejected.[50] An IRS manager is required to sign the OIC return letter if the return is based upon a taxpayer's failure to provide requested financial information.[51] However, we understand that the level of managerial review that actually occurs in such cases is minimal and other OIC return decisions are not subject to review.[52] Thus, the IRS is not fully accountable for the reasonableness of its OIC return decisions.

### Nonprocessability of OICs from Taxpayers in Bankruptcy

Another problem is that OICs from taxpayers in bankruptcy are not considered processable.[53] Nine percent of all "not processable" offers (and one percent of all offers returned after acceptance for processing) are returned because the taxpayer is in bankruptcy, as shown on Table 1.19.2 and Table 1.19.3. The reason given for this policy is that the IRS believes that its centralized "bulk processing" operations can not process an OIC under the time constraints likely to be imposed by bankruptcy courts.[54] From September 1999 through January 1, 2000, before COIC processing was adopted, the IRS processed OICs

---

[49] The few missing pages did not prevent the "reasonable collection potential" (RCP) from being calculated, so the OIC return was not in accordance with IRS procedure. IRM 5.8.3.16 (4) (Rev. 11-15-2004).

[50] See IRC § 7122(d) (providing for appeal of rejected OICs); Treas. Reg. § 301.7122-(f)(5)(i) (same); IRM 5.8.7.2 (Rev. 11-15-2004) (providing that in the case of a "processable return" the IRS will retain the OIC fee and the taxpayer will not receive appeal rights); Treas. Reg. § 301.7122-1(f)(5)(ii) (same). Under a new IRS process OIC returns will be reconsidered by SB/SE in limited circumstances, such as where there was a fire, flood, or death in the taxpayer's immediate family, which prevented the taxpayer from meeting IRS deadlines for submission of information. *See* IRM 5.8.7.3 (Rev. 11-15-2004).

[51] IRM 5.8.7.2.2 (Rev. 11-15-2004). *See also* Treas. Reg. 301.7122-(f)(5)(ii).

[52] IRM 5.8.7.2.2 (Rev. 11-15-2004).

[53] Rev. Proc. 2003-71, 2003-36 I.R.B. 517 § 5.01; Form 656, Offer in Compromise (Rev. 7-2004), 2.

[54] *See* Chief Counsel Notice CC-2004-025 (July 12, 2004) (explaining that "[t]imeframes for the consideration of claims and payment proposals in a bankruptcy case do not mesh with the bulk processing operations established for the high volume of administrative offers in compromise received by the Service."); IRM 25.17.4.7 (Rev. 7-01-2002) (stating that "[t]oo many administrative and legal problems would be created if a tax liability was simultaneously the subject of a court-supervised bankruptcy case and the administrative offer-in-compromise process."). The IRS could also be concerned that any compromise made in connection with a bankruptcy would primarily benefit other creditors rather than the taxpayer, but its policy of excluding taxpayers from the OIC process is not limited to taxpayers facing such situations.

from taxpayers in bankruptcy.[55]  Processing such offers during that period must have been determined to be feasible before the IRS adopted its current centralized "bulk processing" operations.  Thus, IRS' extensive use of centralization and "bulk processing" appears to be driving its current policy of excluding bankrupt taxpayers from the OIC process.

The IRS' policy, however, denies taxpayers the ability to have their OICs considered, and in so doing, effectively denies them a "fresh start" towards future compliance even after completing a bankruptcy proceeding, which is specifically designed for that purpose.[56]  Perhaps this is one reason bankruptcy courts have rejected IRS' policy, overturning it in a number of cases by requiring OICs from bankrupt taxpayers to be processed.[57]

In response to court decisions overturning IRS' policy of not processing OICs from tax-payers in bankruptcy, the IRS Office of Chief Counsel recently issued a notice indicating that, in lieu of considering an OIC, the IRS would in limited circumstances consider accepting less than the debtor would otherwise be required to pay under the Bankruptcy Code in the context of approving a bankruptcy plan.[58]  The IRS will not agree to accept less, however, unless no lower priority creditor is paid.[59]  This policy applies even if paying a lower priority creditor is necessary for the production of income or otherwise makes sense for the government.[60]  The reason for such inflexibility is not explained.  In addi-tion, under its new procedures the IRS will not consider confirming a bankruptcy plan based upon Effective Tax Administration considerations, even if those considerations would theoretically be considered in connection with an OIC outside of bankruptcy.[61]

### Restrictions on Acceptable Offers Unlikely to Increase Collections

OICs based upon "doubt as to collectibility" (DATC) that are not returned are subject to a rigid evaluation process that in some cases ignores reality.  To the extent this process reduces the IRS' ability to realistically evaluate each individual offer, it is inconsistent with the IRS' goal of collecting liabilities at the earliest possible time and at the least cost to the government.[62]  The overall result of several IRS OIC policies can be illustrated by the following example.

---

[55] See CCA 200011046 (March 17, 2000).

[56] See Burlingham v Crouse, 228 US 459, 473 (1913).  See also Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 137, 93d Cong. 1st Sess, pt 1, 75, 68-83 (1973).

[57] See In re Macher, 303 B.R. 798 (W.D. Va. 2003), nonacq., 2004-32 I.R.B. 154 (Aug. 9, 2004); In re Holmes, 298 B.R. 477 (M.D. Ga. 2003), aff'd, 309 B.R. 824 (M.D. Ga. 2004); In re Mills, 240 B.R. 689 (S.D. W.V. 1999); In re Chapman, 84 A.F.T.R. 2d 99-5271, 99-2 U.S.T.C.¶50,690 (Bankr. S.D. W.V. 1999).

[58] See Chief Counsel Notice CC-2004-025 (July 12, 2004).

[59] See id.

[60] See id.

[61] The standard criteria for evaluating an OIC will not be used to evaluate plans/offers submitted by taxpayers in bankruptcy.  See id.  The criteria IRS will use for evaluating plans/offers submitted in bankruptcy is whether the plan/offer is in the government's best interest, subject to various unexplained limitations.  Id.  This combi-nation of general acceptance criteria and specific limitations is likely to result in the acceptance of few plans/offers under the new criteria.

[62] Policy Statement P-5-100, IRM 1.2.1.5.18 (Rev. 1-30-1992).

**Example:** A taxpayer filed an offer for $15,000, to be funded by loans from relatives. The IRS returned the offer because the taxpayer was in bankruptcy. Following bankruptcy, he submitted the OIC again, but it was rejected on the grounds that the taxpayer needed to increase the offer amount to more than $28,000. Due to the taxpayer's bankruptcy and financial condition, he could not borrow the suggested amount. The decision was sustained by Appeals. The IRS later classified the taxpayer's account as "currently not collectible" based on his financial statement indicating that his necessary living expenses exceeded his monthly income. Because the IRS returned the offer, the taxpayer had to spend the time and resources to submit it twice; and by returning and rejecting the offer, the IRS had to process it twice and ultimately lost the opportunity to collect $15,000 in cash.

At the National Taxpayer Advocate's request, SB/SE agreed to work with the IRS' Office of Program Evaluation, Research, and Analysis (OPERA) to study the outcome of rejected offers.[63] This study confirms that by returning and rejecting OICs, the IRS is missing opportunities to collect what can reasonably be collected at the earliest possible time and at the least cost to the government.[64]

### Rejection of OICs in Favor of Extended Installment Agreements

An offer based upon doubt as to collectibility will be summarily rejected if, based upon the IRS' projections of the taxpayer's future income, he or she could fully pay the liability within the original collection statute of limitations period **plus five years**.[65] This is because such taxpayers qualify for long-term installment agreements.[66] As an illustration, consider the following two hypothetical cases:

**Example:** In both cases, ten years remain until the collection statute of limitations expiration date (CSED). In the first, the IRS projects that the taxpayer could fully pay the liability within 15 years. Because the taxpayer could fully pay within the CSED plus five years the IRS will reject the tax-

---

[63] National Taxpayer Advocate, *Annual Report to Congress*, Publication 2104 (Rev. 12-2002), 17; National Taxpayer Advocate, *Annual Report to Congress*, Publication 2104 (Rev. 12-2003), 101.

[64] SB/SE Payment Compliance and Office of Program Evaluation and Risk Analysis (OPERA), *IRS Offers in Compromise Program, Analysis of Various Aspects of the OIC Program*, 11 (Sept. 2004).

[65] *See* IRM 5.8.1.1.3 (Rev. 11-15-2004) (stating: "Offers will not be accepted if it is believed that the liability can be paid in full as a lump sum or under current installment agreement guidelines."); IRM 5.8.3.12(2) (Rev. 5-15-2004) (same); IRM 5.8.4.5 (Rev. 11-15-2004) (same); IRM 5.14.2.1 (Rev. 3-30-2002) (providing that to be eligible for an installment agreement a taxpayer must full pay within the collection statute of limitations period, which the IRS will extend for up to 5 years); IRM 25.6.18.2 (Rev.10-1-2002) (same).

[66] *Id.* Section 843 of the American Jobs Creation Act of 2004 (P.L. 108-357), allows partial payment installment agreements, consistent with the recommendation of the National Taxpayer Advocate. See National Taxpayer Advocate, *FY 2001 Annual Report to Congress*, Publication 2104 (Rev. 12-2001), 210-214. While the new law is likely to reduce the number of offers submitted, it remains to be seen how it will affect IRS' existing offer policy. TAS will be monitoring IRS' implementation of the new law to ensure that it is not used to reduce access to the OIC program.

payer's OIC.[67]  In the second, the IRS projects that the taxpayer could fully pay the liability in 16 years.  Because he could not fully pay within the CSED plus five years, he is eligible for an OIC requiring him to pay an amount that only takes into account his future income for four or five years, depending on the OIC payment terms.[68]

This policy may have particularly harsh consequences when full payment of the liability would subject the taxpayer to "economic hardship"[69] because the IRS' internal guidance does not make it clear that economic hardship should be taken into account in this "full pay" determination, even though it would be taken into account in determining an acceptable offer amount after the "full pay" determination.[70]  OICs are intended as an alternative to both protracted installment agreements and placing taxpayers in "currently not collectible" (CNC) status based on the IRS' implicit determination that "protracted installment agreements" and CNC status are less effective in collecting liabilities and in promoting future compliance.[71]  An IRS study recently concluded that the "CSED plus five" policy should be eliminated based upon evidence that it may actually reduce collections.[72]

> **Example:**  A 72-year-old taxpayer with severe mental and physical disabilities offered to pay over $2,000 to settle a $22,000 liability.  A COIC employee rejected the offer because he or she projected that the taxpayer could "full pay" the liability over almost **14 years.**  The calculations

---

[67] If this can be determined based upon information submitted by the taxpayer, no communication with the taxpayer is required prior to rejecting the offer.  IRM 5.8.4.5 (Rev. 11-15-2004).

[68] Form 656, Offer in Compromise (Rev. 7-2004), 6-7; IRM 5.8.5.5.4(2) (Rev. 11-15-2004).

[69] An "economic hardship" is the inability to meet basic living expenses.  Treas. Reg. § 301.6343-1(b)(4);Treas. Reg. § 301.7122-1(b)(3).  In addition, factors such as the taxpayer's age and employment status; number, age and health of the taxpayer's dependents; cost of living in the area the taxpayer resides; and any extraordinary circumstances such as special education expenses, a medical catastrophe or natural disaster may be taken into account.  IRM 5.8.11.2.1(5) (Rev. 5-15-2004).

[70] See IRM 5.8.1.1.3(2) (Rev. 11-15-2004) (prohibiting acceptance, without exception for hardship); IRM 5.8.1.1.3(3) (Rev. 11-15-2004) (discussing hardship, but not indicating relevance to the full pay analysis); IRM 5.8.3.12(2) (Rev. 5-15-2004) (no exception); IRM 5.8.4.4(3) (Rev. 11-15-2004) (no exception); IRM 5.8.4.5(2) (Rev. 11-15-2004) (no exception); IRM 5.8.4.5(3) (Rev. 11-15-2004) (discussion of special circumstances, but not indicating relevance to full pay analysis); IRM 5.8.4.6 (Rev. 11-15-2004) (conflicting flow chart entries); IRM 5.14.2.1(15)(d) (Rev. 3-30-2002) (vague exception for "age or ill health," but not indicating relevance to full pay analysis); IRM 5.8.11.2(1) (Rev. 5-15-2004) (discussing compromise based on hardship where full payment is possible, but not indicating relevance to full pay analysis process).  Even if economic hardship is taken into account in the full pay analysis, IRS is unlikely to be able to fully evaluate it without communicating with the taxpayer (which is not done in connection with the full pay analysis) since the analysis may involve subjective judgments about the extent of the hardship that is created by collection.

[71] See SB/SE Payment Compliance and OPERA, *IRS Offers in Compromise Program, Analysis of Various Aspects of the OIC Program,* September 2004, 11-13.  See also, Policy Statement P-5-100, IRM 1.2.1.5.18 (Rev. 1-30-1992); Form 656, Offer in Compromise (Rev. 7-2004), p 1.  However, IRS has recently redefined the term "protracted" so as to lose all restrictive meaning.  See IRM 5.8.1.1.3(1) (Rev. 11-15-2004) (stating that "a protracted installment agreement is defined as being one that extends beyond the period allowed under IRS issued guidelines.").

[72] SB/SE Payment Compliance and Office of Program Evaluation and Risk Analysis (OPERA), *IRS Offers in Compromise Program, Analysis of Various Aspects of the OIC Program,* September 2004, 11-13.

assumed that the taxpayer could access the equity in his mobile home, even though a second mortgage or refinancing would be impossible. The employee also assumed that the taxpayer could access equity in his car, even though the car loan exceeded the car's blue book value. In addition, the IRS's analysis did not address economic hardship. A few months after the offer was rejected the taxpayer's account was placed in CNC status and the taxpayer died.

*Calculating a Reasonable Offer Amount*

The IRS continues to have difficulty calculating a reasonable offer amount.[73] Absent special circumstances, the IRS will not accept an OIC based upon DATC unless the taxpayer offers to pay his or her "reasonable collection potential" (RCP).[74] A taxpayer's RCP equals the net equity in the taxpayer's assets plus the amount the IRS could collect from his or her future income (less necessary living expenses) over a set number of months (48 months, 60 months, or the period remaining before expiration of the collection statute of limitations period, depending on the type of offer).[75] If RCP is not calculated utilizing reasonable assumptions, many offers will be unnecessarily rejected. A recent IRS study has concluded that the IRS needs to reevaluate its method of determining reasonable collection potential because the significant number of taxpayers in CNC status who cannot qualify for an OIC suggest that the RCP does not actually reflect the "reasonable" collection potential.[76]

*Declining OIC Acceptance Rate Unexplained*

The unexplained reduction in OIC acceptance rates, from 39 percent in FY 2001 before COIC was adopted to 16 percent in FY 2004, as shown on Table 1.19.1, OIC Dispositions, Fiscal Year Comparison, suggests that OIC acceptance policies have become stricter, decision quality in the COIC program is declining, or taxpayers have become less reasonable in making offers. If quality is improving, the declining acceptance rate suggests that the IRS has a deteriorating taxpayer communication problem (prompting taxpayers to submit unrealistic OICs) or continues to adopt policies that result in the rejection of reasonable OICs.[77] IRS should research the declining OIC acceptance rates to determine the cause.

[73] According to IRS quality measures, the IRS' ability to determine the correct offer amount declined from 67 percent in FY 2001 (before COIC processing) to 58 percent in FY 2003. SB/SE Performance Measurement, Collection Quality Measurement System (CQMS) database, Closed Date Compressed Report – National Results, FY 2001 and FY 2003. IRS has no statistics to indicate whether COIC decision quality has improved in FY 2004 or continued to decline.

[74] *See* Form 656, Offer In Compromise (Rev. 7-2004) 5. "Special circumstances" are commonly based on an "economic hardship," described above. IRM 5.8.11.2.1(2) (Rev. 5-15-2004).

[75] *See* Form 656, Offer In Compromise (Rev. 7-2004) 6.

[76] SB/SE Payment Compliance and Office of Program Evaluation and Risk Analysis (OPERA), *IRS Offers in Compromise Program, Analysis of Various Aspects of the OIC Program*, 13 (Sept. 2004).

[77] It is possible that misinformation is being disseminated by a few practitioners, but that would also be a communications/enforcement problem that the IRS should identify and address.

### Calculating RCP – Deviating from Expenses Guidelines

Taxpayers and practitioners complain that IRS employees sometimes strictly adhere to the expense guidelines, notwithstanding facts and circumstances which indicate that they are not appropriate in a given case.[78]  The RCP is determined based in part on an analysis of the taxpayer's basic living expenses.[79]  The IRS established national and local standards as guidelines for certain expenses such as groceries, household expenses, housing and transportation.[80]  Despite these guidelines, the Code requires IRS employees to evaluate the facts and circumstances of each taxpayer in determining an acceptable offer amount.[81]

One recent court case illustrates a rigid application of the expense guidelines.  In *Fowler v. Commissioner*, T.C. Memo 2004-163, the taxpayer submitted an OIC for $2,400 to be paid in monthly installments of $100.  The IRS determined the minimum acceptable amount was a lump sum of $2,400 based on the value of the taxpayer's automobile, decided the taxpayer could not make the $100 payments over time, and rejected the offer.  In making this determination, IRS used the national standard expenses, which were higher than the expenses claimed by the taxpayer.  The Tax Court held that use of the national standards was an abuse of discretion, noting that there was no explanation of why the taxpayer's expenses were too low or why the national standard expenses were more accurate.  While one case is not conclusive, the fact that the IRS did not take a realistic look at the taxpayer's offer, provide a convincing rationale for its decision or settle this case (which was not decided within two years) suggests that in some cases IRS may be having difficulty deviating from the expense standards.

Another recent case suggests that IRS' difficulty in accepting a taxpayer's claimed expenses (rather than using the expense guidelines) sometimes results from documentation requirements that are not clearly communicated to the taxpayer.

> **Example:**  An offer submitted by a 72-year-old taxpayer was rejected based upon the disallowance of expenses such as transportation (cab fares), over-the-counter drugs and insurance premiums, which were not documented to SB/SE's satisfaction.  On appeal the OIC was accepted for an amount significantly less than required by SB/SE because TAS worked with the taxpayer to obtain further documentation of his expenses.  The OIC could have been more realistically evaluated and accepted without the necessity of an appeal if time had been taken to communicate IRS documentation requirements more clearly to this elderly taxpayer.

---

[78] *See, e.g.*, 2003 Nationwide Tax Forum Focus Groups Customer Satisfaction Issues of Practitioners, Project 01.08.005.03, 4; Robert Zarzar, *AICPA Submits Survey Results On Offer In Compromise Program*, 2003 TNT 200-38 (Oct. 15, 2003) (providing survey results reflecting the "nearly unanimous" opinion of surveyed AICPA members that the IRS is intentionally looking for reasons to reject an OIC).

[79] *See* Form 656, Offer In Compromise (Rev. 7-2004) 5.

[80] IRM 5.15.1(7) (Rev. 11-15-2004).

[81] IRC § 7122(c)(2); Treas. Reg. § 301.7122-1(c).

SB/SE should evaluate the extent to which its perceived inflexibility in deviating from the expense guidelines results from a practice of imposing unnecessary substantiation require-ments or from a failure to effectively communicate the requirements to taxpayers or their representatives.

### Calculating RCP – Determining the Number of Months of Future Income

The amount of future income to be taken into account in determining an acceptable offer amount depends upon how quickly the taxpayer proposes to pay the liability.[82] Regardless of the payment period a taxpayer is never required to offer an amount that the IRS could collect out of future income for a period beyond the end of the statutory period for col-lecting the tax. However, we have been advised by practitioners that campuses sometimes reject offers that do not take into account future income over 48 or 60 month periods, regardless of how many months are actually left on the statutory period for collection.[83]

### Calculating RCP – Future Income Projection

The Internal Revenue Manual maintains a rigid income-averaging calculation as the basis for determining future income for sporadic earners, even though other estimates may prove to be more accurate.[84] That is, the future income of a taxpayer who is currently unemployed may be calculated based on his or her past earning history, regardless of job market prospects or other external factors. This policy may also result, for example, in the assumption that income from a one-time windfall will be received again in the future. This approach will lead the IRS to reject reasonable offers because it ignores the facts of the taxpayer's case in determining a reasonable offer amount.

### Calculating RCP – Excluding State Tax Expenses

The IRS' treatment of state and local tax expenses in calculating RCP is also unrealistic. In calculating future income, monthly payments to state or local taxing agencies for delin-quent taxes are not taken into account as expenses, even if the state or local taxing agency is collecting funds through a wage attachment or installment agreement.[85] In contrast, the IRS allows these expenses when calculating future income for an installment agreement that provides for full payment of the liability.[86]

---

[82] Form 656, Offer in Compromise (Rev. 7-2004), 6-7; IRM 5.8.5.5.4(2) (Rev. 11-15-2004).

[83] Perhaps this is a result of the oversimplification provided in IRM 5.8.5.5(1) and IRM 5.8.5.6(2), which state the general 48 and 60 month rules but omit the important exception found in IRM 5.8.5.5.4 that "for cash and short term deferred offers, when there are less than 48 or 60 months remaining on the statutory period for collection, use the number of months remaining." In addition, one version of the software used by SB/SE personnel to estimate a taxpayer's ability to pay erroneously provides that "48 months is the minimum factor used to calculate future payment ability per OIC guidelines."

[84] IRM 5.8.5.5(5) (Rev. 11-15-2004); IRM 5.8.5.6(6) (Rev. 11-15-2004). By "sporadic earner" we mean persons with a history of irregular employment or income. In many such cases, the use of a collateral agreement is a reasonable alternative to income averaging. A collateral agreement requires a taxpayer to provide additional consideration for an offer in compromise in the event that the taxpayer's income exceeds agreed thresholds. *See* Form 2261, Collateral Agreement - Future Income (Individual) (Rev. 4-1995); IRM 8.13.2.4.6 (Rev. 6-8-2000).

[85] *See* IRM 5.8.5.5.2(8) (Rev. 11-15-2004); IRM Exhibit 5.15.1-2 (Rev. 3-31-2000); IRM Exhibit 5.19.1-12 (Rev. 12-15-2002).

[86] *See* IRM 5.8.5.5.2(8) (Rev. 11-15-2004).

The IRS' rationale for excluding delinquent state and local tax expenses from the OIC RCP calculation is that a federal tax lien would take priority over a state tax lien on future income in the context of enforced collection.[87]  The IRS may have concluded that allowing such expenses in cases where the IRS accepts less than full payment gives the state and local authorities a greater priority than they would receive in the context of enforced collection at the expense of the federal government.  However, this reasoning ignores the fact that the OIC program is an alternative to enforced collection.  Unless the government determines that its interest is best served by enforced collection, the priority of the federal government's tax lien on future income is not determinative of what constitutes a reasonable offer.

Alternatively, the IRS could have concluded that a taxpayer's remedy is to negotiate with the state and local authorities.  However, this is unrealistic because the IRS' future income formula allows for no amount to be paid to state and local authorities, and so it leaves no room for compromise.  The IRS' disallowance of state and local tax expenses is likely to drive taxpayers out of the OIC program even in cases where the IRS would collect a smaller amount through bankruptcy or through enforced collection (*e.g.*, because the tax-payer is funding the offer, in part, with exempt assets or assets from friends or family).  This policy will not help the IRS reach a reasonable settlement with taxpayers, and may not make sense if IRS collects less than half of the amount offered in 44 percent of the rejected offers from individuals, as suggested by a recent study.[88]

### Appeals' Response to Increasing OICs

As OIC rejections have increased, so have OIC appeals.[89]  OIC appeals make up an increasing percentage of Appeals' total case receipts, rising from about ten percent in fiscal year 2002 to about 17 percent in fiscal year 2004.[90]  Appeals has responded to increasing OIC receipts by increasing its focus on cycle time.[91]  It reports reducing its OIC cycle time by 25 percent since May 2002.[92]  Appeals' cycle time reduction initiatives include moving the majority of its OIC work to the campuses.[93]

---

[87] IRM 5.8.5.5.2(8) (Rev. 11-15-2004).

[88] SB/SE Payment Compliance and Office of Program Evaluation and Risk Analysis (OPERA), *IRS Offers in Compromise Program, Analysis of Various Aspects of the OIC Program*, 8, 11 (Sept. 2004).

[89] Taxpayers appeal about 58 percent of all rejected OICs.  Letter from Mark W. Everson, Commissioner, Internal Revenue Service, to Charles E. Grassley, Chairman, Committee on Finance, United States Senate, 4 (Oct. 28, 2004).

[90] IRS, Business Performance Management System, *Key Statistical Chart for Appeals*, FY 2002 and FY 2004.  No comparable statistics are available for FY 2001 prior to the adoption of COIC.

[91] IRS, Roadmap to Success – Guidance to Appeals Field Operations FY 2004, 10.

[92] IRS, Business Performance Review, Appeals Division, 9, (Feb. 24, 2004).

[93] *Id.*, at 15.  In addition, Appeals has directed its Area Directors to require taxpayers to provide any additional information in no more than 30 days.  IRS, Roadmap to Success – Guidance to Appeals Field Operations FY 2004, 10.  This presents fairness issues for taxpayers whose cases have languished in Appeals' inventory for more than a year and for whom responding within the 30 day period may present a hardship.

However, survey results show that Appeals' OIC customers are more dissatisfied with Appeals than other customers exposed to the Appeals process.[94]  The survey indicates that the highest priority of both satisfied and dissatisfied customers was "fairness in resolving your case."[95]  Thus, any reductions in cycle time that come at the expense of fairness, as increasing use of campus processing could, are unlikely to improve customer satisfaction.

Appeals could further reduce its OIC inventory without sacrificing customer satisfaction by assisting SB/SE in improving its OIC decision quality.  Appeals accepts offers from about 28 percent of taxpayers appealing a rejection by SB/SE.[96]  Since Appeals employees are reviewing the work of SB/SE employees when they review OIC appeals, they are in an excellent position to identify areas where SB/SE makes the most frequent errors (or at least areas where Appeals and SB/SE disagree).  Appeals refers many of the OICs that it accepts to a quality reviewer and is undertaking a more comprehensive review of these offers to identify areas where Appeals and SB/SE may have differing views of the IRM.[97]  We commend these efforts.  However, Appeals could further reduce its OIC inventory by routinely and systematically identifying areas where SB/SE employees make frequent errors (or, if not errors, where Appeals and SB/SE have disagreement) so that SB/SE can focus its training and guidance efforts accordingly.  Appeals could track the reasons for reversing SB/SE's OIC rejections on a computer database so that SB/SE could quickly identify problem areas and take immediate corrective action.  This might improve the quality of SB/SE decisions, increase the number of OICs accepted by SB/SE, and reduce OIC appeals.[98]

### Non-Hardship Effective Tax Administration (ETA) Offers

The IRS remains unable or unwilling to accept ETA offers based upon equity and public policy considerations.[99]  In FY 2004, a single offer was accepted by the IRS' ETA offer group, which is responsible for processing them.  In addition, the IRS Office of Chief Counsel has declined the National Taxpayer Advocate's request to revise the ETA regulations under IRC § 7122 to provide more specific guidance regarding how ETA authority

---

[94] Pacific Consulting Group, *IRS Customer Satisfaction Survey, Appeals National Report, April through September 2003*, Appendix B-3 (January 2004), 42.  According to the survey results, 28 percent of the respondents were dissatisfied with all Appeals programs versus 49 percent who were dissatisfied with Appeals' OIC program.

[95] *Id.* at 29, 30.  "Fairness" was an even higher priority than the length of the process for both groups of taxpayers.

[96] E-mail response to request for information from Director, Appeals Tax Policy and Procedure (SB/SE and W&I) (Nov. 8, 2004).  Some such acceptances may have resulted from the submission of new information, such as a new financial statement that reflects a deteriorating financial situation, or an increase in the offer amount, rather than improper rejections by SB/SE.

[97] E-mail response to request for information from Director Appeals Tax Policy and Procedure (SB/SE and W&I) (Sept. 22, 2004).

[98] In addition, Appeals could further promote and improve the Fast Track Mediation program, as discussed in the Most Serious Problem entitled IRS Mediation Programs, *infra*.

[99] This was previously discussed in the National Taxpayer Advocate's June 2004 report.  See National Taxpayer Advocate, *Fiscal Year 2005 Objectives Report to Congress*, Publication 4054 (Rev. 06-2004), 7-15.  These same considerations are also supposed to be applied to offers based upon doubt as to collectibility with special circumstances.  IRM 5.8.11.2 (Rev. 5-15-2004).

MOST SERIOUS
PROBLEMS

PROBLEMS

should be used.  The National Taxpayer Advocate believes that the IRS' narrow interpretation of the scope of ETA, as discussed in the National Taxpayer Advocate's June 2004 report, is wrong and ignores relevant legislative history.[100]

Instead, the National Taxpayer Advocate believes that IRS policies have narrowly construed equity and public policy (i.e., non-hardship ETA offers) as a basis for compromise, and that the specific circumstances under which IRS would accept a non-hardship ETA offer are unclear.[101]  In the Joint Review of Non-Hardship ETA Program Cases, conducted in June 2004, TAS reviewed the portions of case files sent to the ETA group.[102]  Facts relevant to the analysis were missing in many of the case files.[103]  Because IRS has not provided significant specific guidance, other that the examples in the regulations, regarding when non-hardship ETA offers should be accepted, it is difficult for both IRS personnel and taxpayers to focus on relevant facts and circumstances.  If the applicability of non-hardship ETA remains a mystery, as a practical matter, it will cease to exist.  The National Taxpayer Advocate believes that legislation is required to keep IRS from essentially eliminating non-hardship ETA offers as a basis for compromise.  Such a legislative proposal, titled Offer in Compromise: Effective Tax Administration, is provided in section 2 of this report.

### Hardship Effective Tax Administration (ETA) Offers

The IRS has provided little specific guidance, other than the examples in the regulations, to assist taxpayers and IRS employees in determining when compromise based upon economic hardship is appropriate.[104]  An analysis of economic hardship may involve an evaluation of future expenses which are difficult to project and document, making the IRS reluctant to consider them.  According to Appeals, analyzing doubt as to collectibility offers with special circumstances (which generally involve an economic hardship analysis) is an area where SB/SE and Appeals most frequently have differing opinions.[105]

---

[100] The conference report for the ETA legislation stated, "[t]he conferees expect that the present regulations will be expanded so as to permit the IRS, in certain circumstances, to consider additional factors (i.e., factors other than doubt as to liability or collectibility) in determining whether to compromise the income tax liabilities of individual taxpayers.  For example, the conferees anticipate that the IRS will take into account factors such as equity, hardship, and public policy where a compromise of an individual taxpayer's income tax liability would promote effective tax administration.  The conferees anticipate that, among other situations, the IRS may utilize this new authority to resolve longstanding cases by forgoing penalties and interest which have accumulated as a result of delay in determining the taxpayer's liability."  H.R. Conf. Rep. 599, 105th Cong., 2d Sess. 289 (1998).

[101] See generally Treas. Reg. § 301.7122-1(b)(3); IRM 5.8.11 (Rev. 5-15-2004).

[102] The purpose of this review was not to identify cases that were decided incorrectly.  Because IRS has no specific standards for determining when to accept a non-hardship ETA offer and taxpayers have no guidance regarding which facts are relevant, such an exercise would have required further factual development and an analysis of legal arguments that had not been developed by taxpayers.  This would have been impractical.

[103] Facts that the NTA believes should be relevant to the analysis are described in the legislative proposal entitled Offer in Compromise: Effective Tax Administration, infra.

[104] See generally Treas. Reg. § 301.7122-1(b)(3); IRM 5.8.11.2 (Rev. 5-15-2004).

[105] E-mail response to request for information from Director, Appeals Tax Policy and Procedure (SB/SE and W&I) (Sept. 22, 2004).

This suggests the need for more guidance regarding the specific analysis that IRS will follow in determining when OICs should be accepted based upon economic hardship (under both ETA and doubt as to collectibility with special circumstances).  Furthermore, because the National Taxpayer Advocate believes that the existing rules, which confine the hardships that may be considered to economic hardships of individual taxpayers are overly restrictive, a legislative proposal, entitled Offer in Compromise: Effective Tax Administration, is provided in section 2 of this report to expand those rules.

*Combination Offers*

In addition to submitting an offer solely on the basis of "doubt as to collectibility" (DATC), "doubt as to liability" (DATL), or in furtherance of "effective tax administration" (ETA), offers can be submitted based on any combination of the three (called a "combination offer").[106]  When an OIC is submitted on the grounds of both DATL and DATC, IRS policy requires that the DATC claim be processed first.[107]  The OIC may be returned based upon a failure to provide information that may be irrelevant to consideration of the DATL issues.[108]  If the offer is accepted on the basis of DATC, DATL is not considered.[109]  Thus, the current policy could result in a taxpayer agreeing to pay a debt that is not owed. SB/SE has agreed that this is a problem, but has yet to revise its procedures to address it.[110]

**IRS COMMENTS**

For the past several years, the National Taxpayer Advocate (NTA) has identified the Offer in Compromise (OIC) program as one of the "most serious problems" facing taxpayers in the area of tax administration.  In response, the IRS has worked closely with the NTA to identify opportunities to improve the quality of OIC case decisions, the timeliness of resolving OIC cases, and the service provided to taxpayers attempting to use the OIC process to settle their tax debts.  Less than one percent of all IRS collection cases are resolved through the OIC process and only about two percent of cases worked by the Taxpayer Advocate Service (TAS) involve OIC matters.  Based on TAS' TAMIS database, this percentage has been consistent over the last three years.

During the past year, timeliness of processing OICs has continued to improve and backlogs of unassigned OIC cases have been virtually eliminated.  Currently, the inventory of open OIC cases is at its lowest level since early 1999.  In addition, the OIC application package,

---

[106] IRM 5.8.4.10(1) (Rev. 11-15-2004).

[107] IRM 5.8.4.10(3) (Rev. 11-15-2004).

[108] IRM 5.8.4.10(4) (Rev. 11-15-2004).

[109] *Id.*

[110] We understand that SB/SE's proposed solution is to ask the taxpayer if they want the doubt as to liability issues considered upon completion of the doubt as to collectibility analysis.  E-mail from SB/SE, OIC Program Manager, Payment Compliance (Oct. 10, 2004).  As we understand this proposal, the taxpayer could still be faced with the dilemma of either accepting an offer for more than the correct amount owed or waiting for the IRS to analyze the doubt as to liability issues.



MOST SERIOUS PROBLEMS

Form 656, has been revised to improve the clarity of communications with taxpayers and practitioners regarding the requirements for submitting complete, processable OICs. Feedback from the practitioner community regarding this revision has been very positive.

Maintaining manageable inventory levels contributes to the IRS goal of making quality OIC case decisions in a timely manner.   In November 2003, the IRS implemented the OIC application fee to help offset the significant costs of the OIC program and to discourage inappropriate or frivolous OIC submissions.  In 2004, the IRS completed a major revision of the Internal Revenue Manual on OICs (IRM 5.8) to:

 ◆ provide more clarity in procedural direction,

 ◆ improve the quality of case decisions, and

 ◆ improve taxpayers' opportunities to communicate with the IRS regarding the processing of their offer cases, particularly in cases which the IRS plans to reject or return the OICs.

The IRS devoted considerable time and attention in FY 04 to outreach activities designed to increase the public's awareness of the proper role of the OIC as a collection alternative and to clarify the expectations and requirements for taxpayers to submit processable OICs that can be evaluated and resolved in a timely manner.  In particular, the OIC page on the IRS web site is updated regularly and is now much easier for the public to find and navigate.  The IRS executives and senior managers participated in numerous outreach sessions specifically addressing the OIC program, including the 2004 National Tax Forums. Additionally, the SB/SE Collection and the Taxpayer Education and Communication (TEC) cadre of speakers, who have been trained to address OIC issues, provided similar presentations at local and regional tax practitioner forums.

The IRS believes that many of the recommendations in the NTA's 2004 Annual Report would increase the costs of the OIC program significantly.

### Background

The inventories of open OICs grew dramatically from 1992 to 2001.  By 2001, even though revenue officer staff hours devoted to the program had more than doubled from the 1998 staffing levels, the IRS was continuing to fall behind in maintaining the currency of the OIC inventory, with large backlogs of OIC casework accumulating in every field office.

As a result of implementing the Centralized OIC processing sites in July 2001, and revising operating procedures to improve the efficiency of the OIC process, the IRS reversed the upward trends in inventory growth.  Currently, the inventory of open OICs is at its lowest point since early 1999.  The program remains a very costly one with over 1000 Collection personnel devoted to processing OICs.  The IRS firmly believes that it is in

**MOST SERIOUS PROBLEMS**

**PROBLEMS**

the best interests of tax administration to ensure the OIC program is managed efficiently and provides quality service to those taxpayers who are sincerely attempting to resolve their tax problems through the OIC process.

**COIC Efficiency and Returns**

"Returns" generally fall into two categories - those returned before and those returned after the initial processability determination.  For an offer to be processable, it must meet the following conditions:

  1) the taxpayer must have filed all legally due and required tax returns;

  2) a business taxpayer must be in full compliance with employment tax filing and payment requirements for the two quarters immediately preceding the submission of the OIC, as well as the current quarter;

  3) the taxpayer cannot be involved in an open bankruptcy proceeding;

  4) the OIC must include the $150 OIC application fee (or a Form 656-A requesting a waiver of the fee); and

  5) the OIC must be submitted with the most current OIC application forms.

An OIC which does not meet all of these conditions is returned to the taxpayer, along with any associated application fee.  If the taxpayer resolves the problem conditions, he or she submits a new OIC for consideration.  The recently revised OIC application package, Form 656, gives considerable direction and guidance to taxpayers to help them avoid submitting OICs that are not processable.  The IRS anticipates receiving fewer unprocessable OICs in FY 05.

The number of OICs returned to taxpayers as not processable increased significantly due to the implementation of the OIC application fee, peaking in December 2003 at 64 percent of OIC receipts (44 percent involved the application fee issue).  Due to the IRS' increased communication efforts and taxpayers' increased familiarity with the fee requirement, the percentage of OICs that were returned as not processable decreased to 33 percent by September 2004.  Fifteen percent of these returned receipts involved the application fee, and only eight percent were returned as unprocessable solely due to the fee issue.

Generally, a processable offer is returned when the taxpayer fails to provide complete and timely responses to the IRS requests for additional information.  Since the IRS has already invested considerable resources in the processability determinations, application fee processing, and initial financial analysis of the OICs, the IRS retains the application fee.  If a taxpayer chooses to submit another OIC at a later date, another application fee is required.

The IRS has made a number of processing changes this year to ensure that processable returns are handled reasonably and responsibly.  For example, in situations where taxpay-



SECTION

ONE

ers have made substantially complete responses to additional information requests, the IRS will now attempt an additional contact with the taxpayers to obtain the missing information, prior to returning the OICs.  Return reconsideration procedures have been developed and implemented to address situations where the taxpayers could not respond timely due to circumstances beyond their control.  As a result, OICs returned following acceptance for processing declined 34 percent in FY 04.

**Collectibility Determinations (Reasonable Collection Potential) –
Rejection of OICs in Favor of Extended Installment Agreements**

In March 1998, the IRS determined that an appropriate period of time for an installment agreement was no longer than five years beyond the CSED.  Agreements extending beyond this period are not allowed under our current procedures.  If the taxpayer can full pay the tax liability within the parameters of an installment agreement, i.e., the time remaining until the CSED, plus five years, the IRS generally does not accept an OIC.

As noted in the NTA report, the IRS recently analyzed its practice of including the "plus five years" in the analysis of the taxpayer's ability to make future payments and issued direction to discontinue that practice.  The IRS believes this change should significantly improve both the accuracy of our RCP calculations and the overall quality of our OIC disposition decisions, and also result in more accepted offers.  The percentage of processable offers that were accepted increased by 10 percent last year.  The Treasury Inspector General for Tax Administration (TIGTA) also reported positive results regarding the quality of the IRS' case decisions in their recent reviews of the COIC and Field OIC programs.

**Calculating Reasonable Collection Potential (RCP) –
Deviating From National And Local Standards**

National and local standards were developed to promote consistency among the IRS collectors in the amounts routinely allowed for taxpayer expenses.  The IRS employees are, however, authorized to deviate from these standards in certain situations.

The IRS reemphasizes this direction to OIC personnel on a regular basis.  Earlier this year, the IRS issued additional guidance in the area of reasonable allowances for transportation expenses.  During the past year, the IRS has also asked TAS and the American Institure of Certified Public Accountants (AICPA) to provide examples of any unreasonably rigid adherence to the national standards in OIC casework for evaluation.  Upon receipt of these examples, the IRS plans to use them to enhance OIC processing.

**Calculating RCP – Future Income Projection**

The IRS does not agree that the OIC IRM "maintains a rigid income-averaging calculation as the basis for determining future income for sporadic earners, even though other

estimates may prove to be more accurate."  The IRM (5.8.5.5) allows for alternative methods in appropriate situations:

> In some instances, a future income collateral agreement may be used in lieu of including the estimated value of future income in reasonable collection potential (RCP). When investigating an offer where current or past income does not provide an ability to accurately estimate future income, the use of a future income collateral agreement may provide a better means of calculating an acceptable offer amount. Future income collateral agreements should not be used to enable a taxpayer to submit an offer in a lesser amount than the current or past financial condition dictates. However, if the future is uncertain, but it is reasonably expected that the taxpayer will be receiving a substantial increase in income, it may be appropriate.

The IRS does agree that a few more examples may be helpful regarding this issue, and we will expand the direction accordingly in the next IRM revision.

### Calculating RCP – Excluding State Tax Expenses
When determining RCP, payment of current tax obligations is considered a necessary expense and always is allowed.  In contrast, delinquent state or local tax obligations are treated like other debts and are deducted from reasonable collection potential only to the extent the state tax obligations take priority over the federal tax debt.  Affording special status to state and local taxes as allowable expenses would result in taxpayers with the same collection potential being treated differently based solely on the identities of their other creditors.  The IRM encourages offer specialists to consult with Counsel if the relative priorities are unclear.

### Effective Tax Administration (ETA) OICs
The "non-hardship" ETA OIC is a situation where no doubt exists that the liability is valid, and payment of the tax would not create economic hardship for the taxpayer.  However, due to circumstances of the case, the inequity of requiring the taxpayer to pay the entire liability would be so apparent that the IRS should allow the taxpayer to compromise the tax debt for less than the amount owed.  This component of the OIC program was designed to allow the IRS to settle difficult or unusual cases, where other collection alternatives did not seem appropriate.  In practice, however, we have received very few cases that meet these criteria.

In FY 03, the IRS centralized the processing of "non-hardship" ETA OICs in one field group to ensure consistency in processing these cases and to facilitate oversight of the process.  During the summer of 2004, representatives from the Small Business/Self



SECTION
ONE

Employed (SB/SE) Division, TAS, Counsel and Appeals conducted a joint review of this process. This team reviewed the work papers of all referrals into the ETA group and all OICs worked to completion within the field group during its first year of operation. In its findings, the review team identified opportunities to improve the referral process and document case decisions. However, the team did not identify any cases in which the IRS rejected an offer that should have accepted as a "non-hardship" ETA OIC. As part of their review, the team also concluded that a combination of factors could lead the IRS to accepting such an offer. Based on examples developed by the review team, the IRS expects to issue enhanced guidance in FY 05.

The team's analysis indicates the most problematic component of the "non-hardship" ETA OIC is the requirement that the taxpayer have a clear ability to full pay the tax liability without economic hardship. The examples TAS provided as potential candidates, as well as many of the cases included in the joint review, would actually create the appearance of inequity if the IRS accepted the offers. Routine acceptance of offers in such cases would have a detrimental impact on voluntary compliance.

Generally, experience shows that the inequitable conditions that contribute to the tax delinquencies also tend to create economic hardship on the affected taxpayers. The IRS routinely accepts ETA OICs based on economic hardship, as well as doubt as to collectibility (DATC) OICs involving special circumstances. These OIC categories are worked within all OIC field groups, as well as COIC. Because DATC OICs with special circumstances do not involve situations where the taxpayers can clearly full pay the tax debts, the ETA group does not control them. Rather, the IRS handles them as routine cases, and local management has the authority to approve these case decisions.

The TAS report indicates that the Advocate is including legislative proposals involving the ETA issue. The IRS has not reviewed these proposals for administrability and impact on resources.

### Nonprocessability of OICs from Taxpayers in Bankruptcy

In 1998, the IRS decided to exclude from OIC consideration any taxpayer in bankruptcy. The IRS' temporary change of policy in 1999, to again allow some taxpayers in bankruptcy to file OICs, stemmed from an assumption that this reversal in policy was legally mandated. When the Office of Chief Counsel subsequently disagreed with this interpretation of § 525 of the Bankruptcy Code, the IRS reversed its policy to once again exclude taxpayers in bankruptcy from the OIC process. More recently, courts have held that the IRS's policy does not violate § 525.

Taxpayers who file bankruptcy are protected by the automatic stay while their non-exempt assets are liquidated for the benefit of creditors or, in the case of a Chapters 11, 12, or 13,

**MOST SERIOUS PROBLEMS**

**PROBLEMS**

until a payment plan is approved whereby all creditors are paid over a period of time.  In exchange for the protections and benefits provided by the Bankruptcy Code, taxpayers must abide by Congressional choices that balance a taxpayer's need for a financial fresh start against the competing concerns of various creditors.  By filing bankruptcy, taxpayers make a deliberate choice to follow the Bankruptcy Code's scheme for resolving their debts.  Taxpayers who receive a discharge, or otherwise complete a bankruptcy proceeding, are entitled to avail themselves of the OIC process to resolve tax debts that were not discharged or paid through the bankruptcy case.

In those cases where a determination is made that a taxpayer in bankruptcy cannot comply with the requirements of the Bankruptcy Code, the IRS will consider accepting payment of less than is required to be paid under the Bankruptcy Code.  Taxpayers filing bankruptcy are required to file schedules of assets and liabilities, a schedule of current income and expenditures, a schedule of executory contracts and unexpired leases, and a statement of financial affairs. In most cases, this information will be sufficient for the local Insolvency office to determine whether it is in the IRS' best interests to agree to receive less than is required to be paid under the Bankruptcy Code.

### Combination OICs

The IRS recently completed a pilot project regarding the processing of "combination" OICs where the taxpayers have requested consideration on the basis of both doubt as to collectibility (DATC) and doubt as to liability (DATL).  The IRS found that very few DATL OICs actually involve true liability issues, i.e., there are no disagreements that the tax assessments are valid.  Generally, these cases involve requests for interest and/or penalty abatements, or other adjustments to the balances due that do not require re-examination of the tax returns.

In order to address these combination OICs in a timely manner, the IRS routinely processes the DATC offers first.  If the DATC offer is recommended for rejection, the DATL OIC is forwarded to Examination for consideration.  The pilot project confirmed that most of these DATL claims can be processed efficiently by one collection unit in the Brookhaven Campus, and the IRS intends to expand this approach in FY 05 to include all DATL OICs.  The relatively rare DATL claims that involve actual liability issues will continue to be forwarded to Examination for consideration.

### Appeals

The IRS agrees with the recommendation in the TAS report that systemic identification of errors made on OIC rejections would be beneficial to both SB/SE and Appeals.  In fact, Appeals already is proceeding with plans to provide systemically driven feedback reports to all IRS operating divisions.  For the OIC program, Appeals already has conducted one informal Offer program review through the Automated Quality Measurement (AQMS)



staff and one joint review with the SB/SE Offer program on Appeals' accepted offers. Based on those reviews Appeals has agreed to strengthen its discussion and documentation surrounding our acceptance of offers for two reasons: 1) to enhance guidance and, 2) to ensure Appeals decisions comport with the IRM policies and procedures thus providing credibility to any recommendations we might make for program improvement.

### TAXPAYER ADVOCATE SERVICE COMMENTS

*The National Taxpayer Advocate believes that the IRS has made significant improvements to the OIC program over the last year. Specifically, the IRS should be commended for:*

- *Discontinuing the practice of rejecting OICs on the basis that a taxpayer could pay the liability over the CSED plus five years;*

- *Revising its procedures to make its allowances for transportation expenses more reasonable;*

- *Improving the OIC forms and instructions;*

- *Revising procedures so that when taxpayers make substantially complete responses to information requests, they are contacted before their OICs are returned based on a lack of information;*

- *Instituting OIC return reconsideration procedures in cases where taxpayers could not timely respond to information requests due to certain circumstances that were beyond their control;*

- *Reducing the number of OICs returned after acceptance for processing;*

- *Developing guidance regarding when a "non-hardship" ETA offer should be accepted, which may soon be issued;*

- *Allowing for compromise of liabilities via the bankruptcy process in certain limited circumstances; and*

- *Developing plans to allow for systematic feedback between Appeals and SB/SE.*

*SB/SE worked closely with TAS in developing many of these improvements and we have enjoyed a good working relationship throughout the year. However, the IRS comments suggest that the OIC program is operating so smoothly that it should not be discussed as one of the IRS' most serious problems. The IRS cites data showing that OIC cases represent less than one percent of IRS collection cases and about two percent of cases worked in TAS. These very statistics suggest that OIC cases make up a disproportionate number of TAS referrals given the small size of the OIC program. Further, many taxpayers do not know about TAS, or do not seek TAS' assistance because they do not believe that TAS can be of help to them.[111] This is often true since TAS usually cannot change unreasonable policies as applied to a given case and is generally limited to helping the IRS correctly apply such policies or to recommending systemic change.*

---

[111] *See* the Most Serious Problem entitled *Access to TAS, infra.*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
SUZANNE CARLSON,                    }
                                    }
            Appellant,              }
                                    }
            v.                      }    CIVIL ACTION NO. 05-10227-WGY
                                    }
UNITED STATES OF AMERICA            }
                                    }
            Appellee.               }
_____}

**THE APPELLANT'S MEMORANDUM OF LAW IN SUPPORT OF
HER MOTION TO EXPAND THE RECORD**

The Appellant, Suzanne Carlson, submits this memorandum of
law in support of her Motion to Expand the Record to include data
compiled by the Internal Revenue Service's Taxpayer Advocate
Service.  The Appellant seeks to include in the record a selected
portion of the Taxpayer Advocate's Report to Congress for the
year 2004(hereinafter "the Report"), (pages 311 through 337).
The subject pages evidence the IRS's methodology for evaluating
Offers in Compromise("OIC's") as being fundamentally flawed.

The Report includes information that demonstrates the
impossibility of a fair hearing when the Service's own studies
show that its procedures and policies for the consideration of
Offers in Compromise actually injure both the applicants for an
OIC and the United States.

1

I.   <u>Prodecural History.</u>

The Appellant Suzanne Carlson ("Ms. Carlson") seeks judicial review pursuant to Section 6330(d) of the Internal Revenue Code, of the Appeals Officer's Determination to sustain the United States Notice of Federal Tax Lien and its Notice of Intent to Levy.

II.   <u>Facts.</u>

The Revenue Restructuring and Reform Act of 1998 ("the Act") amended Internal Revenue Code §§7803 and 7811, creating the position of the National Taxpayer Advocate and making her independent within the IRS.[1]

When evaluating an OIC based on "doubt as to collectibility" the IRS uses a reasonable calculation potential formula ("RCP"). However the Internal Revenue Manual ("IRM") provides minimal guidance on how to weigh RCP with other factors such as the age and health of the taxpayer, the likelihood of bankruptcy, the likelihood of enforced collection, or time left on the collection statute.[2]

§7122(c)(2)(B) provides that "...officers and employees of the Internal Revenue Service shall determine **on the basis of facts and circumstances of each taxpayer**, whether the use of

---

[1] www.irs.gov/irs/article/0,,id=101099,00.html

[2] IRM 5.8.4.5.

schedules published under subparagraph (A) is appropriate..."

    III. <u>Law and Argument</u>.

    1.   <u>Discussion of Internal Revenue Code §7803.</u>

    Internal Revenue Code Section 7803(c)(2)(B)(ii) requires the National Taxpayer Advocate file an annual report with the United States Congress.  The report is to contain "full and substantive analysis, in addition to statistical information and shall...(VIII) contain recommendations for such administrative and legislative action as may be appropriate to resolve problems encountered by taxpayers."

    The report must be submitted directly to the above mentioned Congressional Committees without "prior review or comment from the Commissioner, the Secretary of the Treasury, the Oversight Board, any other officer or employee of the Department of the Treasury,"[3] thus providing relevant internal information, analysis and guidance with the least potential of bias.

    Since 2000, the Taxpayer Advocate's Report to Congress has listed Offers in Compromise as one of "most serious problems." (2000 Report, OIC's were problem #10; 2001, #15; 2002, #2; 2003, #7; and 2004, Topic E-19.)

    The ongoing and problematic nature of the Internal Revenue Service's processing of Offers in Compromise clearly demonstrates the relevance of the 2004 Taxpayer Advocate's Report to Congress

---

    [3]§7803(c)(2)(B)(iii).

to the IRS's methodology and potential for abusing its

discretion.  <u>The Report's statistical analysis establishes that</u>

<u>the IRS' practices and procedures in evaluating Offers are so</u>

<u>flawed that they detriment both the United States and taxpayer's</u>

<u>who apply for an OIC.</u>

      2.   <u>The 2004 Taxpayer Advocate's Report to Congress</u>
<u>contains relevant information concerning the IRS's</u>
<u>methodology for evaluating OIC's.</u>

The IRS's goal for the OIC program is to achieve collection

of what is reasonably collectible at the least cost and at the

earliest possible time, and to promote future compliance by

providing taxpayers with a "fresh start." (Report p. 312.)

In 1998, Congress expanded the bases for compromise... based

on its belief that OIC's promote voluntary compliance.  (Report

p. 312.)

The conference report for this legislation explained:

> The conferees believe that the IRS should be flexible in
> finding ways to work with taxpayers who are sincerely trying
> to meet their obligations and remain in the tax system.
> Accordingly, the conferees believe that the IRS should make
> it easier for taxpayers to enter into offer-in-compromise
> agreements, and should do more to educate the taxpaying
> public about the availability of such agreements.  (Report
> p. 312.)

To the contrary, IRS practices and policies continue to make

it very difficult for taxpayers to enter into OICs.  Moreover, a

recent IRS study suggests that in a majority of cases where an

OIC is rejected or returned to the taxpayer, the IRS eventually

collects *less than the amount that was offered.* (Report p. 312.)

Communicating with taxpayers and giving them a reasonable period of time to file any delinquent tax returns prior to returning an OIC would reduce erroneous OIC returns, educate taxpayers, and enable the IRS to both collect money being offered and secure delinquent returns in one fell swoop! (Report p. 316.)

OIC's based upon "doubt as to collectibility" (DATC) that are not returned are subject to a rigid evaluation process that in some cases ignores reality. To the extent this process reduces the IRS' ability to realistically evaluate each individual offer, it is inconsistent with the IRS' goal of collecting liabilities at the earliest possible time and at the least cost to the government. (Report p. 321.)

OIC acceptance rates have fallen from 39 percent in FY 2001 to 16 percent in FY 2004.

3.    The Record is Properly Expanded to Include the
      Information Collected in the Advocate's Report.

The present matter is subject to an abuse of discretion standard. This standard is highly deferential to the United States. Please see Olsen v. United States of America, No. 04-2156 (decided July 8, 2005).

In Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971). The Court found that the general standards of the Administrative Procedure Act require the reviewing court to

5

engage in a substantial inquiry and that the agency's decision while entitled to a presumption of correctness is not shielded from a thorough, probing, in-depth review.

The Court further held:

> The court may require the administrative officials who participated in the decision to give testimony explaining their action. Of course, such inquiry into the mental processes of administrative decisionmakers is usually to be avoided. *United States v. Morgan*, 313 U.S. 409, 422 (1941). And where there are administrative findings that were made at the same time as the decision, as was the case in Morgan, there must be a strong showing of bad faith or improper behavior before such inquiry may be made. But here there are no such formal findings and it may be that the only way there can be effective judicial review is by examining the decisionmakers themselves. *See*, *Shaughnessy v. Accardi*, 349 U.S. 280 (1955).

> Citizens to Preserve Overton Park v. Volpe, at 420.

In this Circuit, a party may supplement the administrative record when such record is inadequate. In Sierra Club v. Marsh, 976 F.2d 763 (1992), the Court held:

> The focal point for a court's review of an agency's decision is the administrative record. *See, e.g.*, *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743, 84 L. Ed. 2d 643 , 105 S. Ct. 1598 (1985); *Camp*, 411 U.S. at 142; *Valley Citizens For a Safe Env't*, 886 F.2d at 460. "The fact that review sometimes or often focuses on the initial record does not mean that it must, or always, will do so." *Valley Citizens For a Safe Env't*, 886 F.2d at 460.

> Where there was a failure to explain administrative action so as to frustrate effective judicial review, . . . the remedy is to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary. *Camp*, 411 U.S. at 143; *see also Overton Park*, 401 U.S. at 420 (stating that where there are no formal findings, examining the decisionmakers themselves may be the only way there can be effective judicial review); *Manhattan Tankers,*

6

*Inc. v. Dole*, 787 F.2d 667, 672 n.6 (D.C. Cir. 1986) (holding that the court "may properly uphold the Coast Guard's decision on the basis of affidavits or testimony by the administrator who made the decision concerning his reasoning at the time of the decision").

The administrative record may be "supplemented, if necessary, by affidavits, depositions, or other proof of an explanatory nature." *Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 357 (8th Cir. 1984) (*quoting Independent Meat Packers Ass'n v. Bertz*, 526 F.2d 228, 239 (8th Cir. 1975) (*citations omitted*)), *cert. denied*, 469 U.S. 1158 (1985). The new material, however, should be explanatory of the decisionmakers' action at the time it occurred. No new rationalizations for the agency's decision should be included, *see, e.g., Sierra Club v. United States Army Corps of Engineers*, 771 F.2d 409, 413 (8th Cir. 1985); *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981); *Asarco, Inc. v. United States Envtl. Protection Agency*, 616 F.2d 1153, 1159 (9th Cir. 1980), and if included should be disregarded. "If the agency action, once explained by the proper agency official, is not sustainable on the record itself, the proper judicial approach has been to vacate the action and to remand . . . to the agency for further consideration." *Costle*, 657 F.2d at 285; accord *Camp*, 411 U.S. at 143; *Asarco, Inc.,* 616 F.2d at 1159.

IRC 6330(c)(3) states:

The determination by an appeals officer under this subsection shall take into consideration--
                    ...
(C) whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the person that any collection action be no more intrusive than necessary.

The balancing required by IRC § 6330 can not be lawfully

completed when the methodology employed by the Service for the

evaluation of OIC's is fatally flawed.

This Court's full and complete review properly includes a

consideration of the methodology employed the IRS. This

7

information is not included in the record, nor will it be until it is included in ongoing CDP hearings. The ongoing hearings which unavoidably will fail the requirements of the law will inevitably be brought before the Court.  It would be an injustice to taxpayer's whose matters were heard when the data of the Report was assembled, not to have judicial review of those matters considered in light of the fact that a central part of the  Service's determinations pursuant to IRC §§ 6320 and 6330 are based upon its failed methodologies.

IV. <u>Conclusion.</u>

The Appellant's Motion to Expand the Record is properly granted.

The Record provides little if any insight as to the policies and procedures followed by the Appeals Officer in making her determination.

The information that the Appellant seeks to include in the Record is a relevant compilation of statistical analysis created by the Internal Revenue Service's Taxpayer Advocate which may assist the Court in its determination of whether there was an abuse of discretion warranting a remand of the matter.

8

Suzanne Carlson,
By her attorney,


/s/ Timothy J. Burke
Timothy J. Burke
Burke & Associates
400 Washington Street
Braintree, MA 02184
(781)380-0770


**CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the above document was served upon the attorney of record via first class mail on July 19, 2005.

/s/ Timothy J. Burke

9

10

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETT

| | |
|---|---|
| SUZANNE CARLSON, | } |
| | } |
| Appellant, | } |
| | } |
| v. | }    **CIVIL ACTION NO. 05-10227-WGY** |
| | } |
| UNITED STATES OF AMERICA | } |
| | } |
| Appellee. | } |
| | } |

## APPELLANT'S MOTION TO EXPAND THE RECORD

The Appellant moves this honorable Court to expand the present record in the above entitled matter to include data which the Internal Revenue Service has accumulated and which evidences that its methodology for evaluating Offers in Compromise (OIC's) filed by businesses is fundamentally flawed. The information which the Appellant requests be included in the record is contained the Taxpayer Advocate's Report for the year of 2004. (A copy of pages 311 through 337 of the Taxpayer Advocate's Report to Congress is included in the Addendum.  The page numbers referenced below are the page numbers of "the Report".)

The information is as follows:

1.   [A] recent IRS study suggests that in a majority of cases where an OIC is rejected or returned to the taxpayer, the IRS eventually collects *less than the amount that was offered.* (Report p. 312.)

1

2.    The IRS eventually collected less than 80 percent of
      what individual taxpayers were offering in 54 percent
      of the OIC's it rejected and in 66 percent of the OIC's
      that it returned after processing. (Report p. 311.)

3.    The IRS eventually collected less than half of what
      individual taxpayers were offering in 44 percent of the
      OIC's it rejected and in 59 percent of the OIC's that
      it returned after processing. (Report p. 311.)

4.    That 45 percent of the business tax accounts associated
      with rejected or withdrawn OIC's were classified as
      "currently not collectible". (Report p. 311.)

5.    The IRS collected nothing from business taxpayers in 46
      percent of the OIC's that it rejected and 60 percent of
      the OIC's that it returned after acceptance for
      processing. (Report p. 311.)

6.    Communicating with taxpayers and giving them a
      reasonable period of time to file any delinquent tax
      returns prior to returning an OIC would reduce
      erroneous OIC returns, educate taxpayers, and enable
      the IRS to both collect money being offered and secure
      delinquent returns in one fell swoop! (Report p. 316.)

Wherein the United States is granted great deference under
the "abuse of discretion" standard, the above information may be
of assistance to the Court in ascertaining whether the government

2

abused its discretion by the use of a methodology to evaluate

OIC's which is so fundamentally flawed that it fails to meet the

interests of the United States and taxpayers more often that it

succeeds.

      WHEREFORE, the Appellant prays that this honorable

Court expand the record.

                         Suzanne Carlson,
                         By her attorney,


                         /s/ Timothy J. Burke
                         Timothy J. Burke
                         Burke & Associates
                         400 Washington Street
                         Braintree, MA 02184
                         (781)380-0770

## <u>CERTIFICATION PURSUANT TO L.R. 37.1(b) and L.R. 7.1</u>

I hereby certify that on July 5th, 14th, and 19th of 2005 the undersigned and Melissa Halbig of this office contacted Barry Reiferson to discuss the Appellant's motion.  After some discussion, Mr. Reiferson requested the reasons for filing the Motion, to which we supplied the attached Memorandum in Support of it early today and did not receive a response.  Accordingly, the issues cannot be narrowed.

/s/ Timothy Burke
Timothy Burke

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the following attorney of record by mail, postage prepaid, on July 19, 2005.

Barry Reiferson
U.S. Department of Justice - Tax Division
Post Office Box 55
Ben Franklin Station
Washington, DC 20001

/s/ Timothy Burke
Timothy Burke

4

ADDENDUM